GWENDOLYN J. GEORGE, APPELLANT, V. GUARANTEE MUTUAL
LIFE COMPANY, APPELLEE.

13 N. W. 2d 176

FILED FEBRUARY 25, 1944.   No. 31654.

*Hoagland, Carr & Hoagland* and *Ira D. Beynon,* for appellant.

*Beatty, Maupin & Murphy* and *Cranny & Moore, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

The widow and beneficiary brought suit against defendant company to recover on two $5,000 life insurance policies, issued to the deceased May 22, 1941. At the conclusion of all the evidence, the trial court upon motion discharged the jury, and entered a judgment for the defendant.

Plaintiff's petition alleged that on May 22, 1941, Henry George made application to the defendant company for $10,000 life insurance, and under the same date two policies of $5,000 each were issued to him, the plaintiff herein being the beneficiary; that when he made the application, Henry George paid the premiums in the amount of $515, and said policies were delivered on June 3, 1941, and remained in full force and effect during his lifetime. The petition further states that Henry George died May 27, 1942, and proofs of death were sent to defendant on June 10, 1942, and demand made for the payment of the amount of said policies due plaintiff, but defendant refused payment; wherefore, plaintiff prays judgment against defendant in the sum of $10,000, together with interest from May 27, 1942, and costs.

Defendant's answer, of some 15 pages, admitted the application, issuance and delivery of the two policies, and the payment of premiums thereon, also admitted the death of Henry George on May 27, 1942, the receipt of proof of death, and the demand for payment on the policies, and the

refusal to pay, but denied every other allegation contained in the petition.

For further answer, defendant alleges that the applicant went before defendant's medical examiner, Dr. E. C. Stevenson, and made answers on medical examination blanks, stating that within the last ten years he had not consulted a physician, was in good health, and had never been under observation, care or treatment in any hospital, had not decreased in weight in the past three years, and that there had never been any cases of insanity, epilepsy or suicide in the family. Defendant claims that all of said answers were untrue, and that Henry George fraudulently concealed the truth, as he had been treated by physicians in North Platte and Omaha within ten years prior to May 22, 1941, for an illness of the gastro-intestinal tract; that he knew he was not in good health, and had been advised to have an immediate surgical operation as a result of a physical examination to which he had submitted at Omaha on May 19, 20 and 21, 1941, immediately prior to his making application for insurance; that he had been under observation, care and treatment in Immanuel Hospital, Omaha, on said dates; that the weight of Henry George had decreased; that there had been cases of insanity and suicide in the family, his sister, Emma George, being now confined in the Nebraska State Hospital for the Insane at Hastings, and his brother, William George, having committed suicide in Idaho on March 2, 1936, instead of dying of "flu" after a two weeks' illness in 1939, as stated in the application.

It is further alleged that the information sought to be elicited by the questions was material to the risk; that the defendant relied on the truthfulness of such answers and information, and was deceived to its injury, and that defendant would not have issued the policies of insurance if insured had truthfully answered the questions propounded, and had not fraudulently concealed the truth from defendant.

It is further specifically charged in defendant's answer that at least six months before May 22, 1941, the insured

became ill with cancer of the rectum, and consulted with Dr. T. J. Kerr of North Platte, and was continuously treated by said doctor for the diseases of colitis and diarrhea until May 17, 1941, when, having failed to respond to such treatment, he was advised by Dr. Kerr to consult either Dr. Louis E. Moon, of Omaha, or Mayo Clinic, of Rochester, Minnesota, for this disease in the rectum; that thereupon insured went to Omaha on May 19, 1941, and was examined by Dr. Louis E. Moon, who committed him to Immanuel Hospital for a biopsy and X-ray examination, and said examination disclosed that insured had a large cancer of the rectum, and Dr. Moon advised an immediate operation for the removal of same; that Henry George told the doctor he would go home and arrange his business affairs and then return for the operation in a few days.

Thereupon, the insured, well knowing that he was afflicted with a serious and probably fatal disease, for which he had been treated for months, and knowing that he was at once going to undergo a serious major operation, and with the express fraudulent purpose to deceive and defraud defendant by unlawfully procuring insurance from it, went to Gothenburg on May 22, 1941, and solicited the agent to sell him $10,000 worth of life insurance in defendant company.

Defendant further alleges that the insured, in furtherance of his unlawful and fraudulent purpose, falsely stated to the agent of defendant that he wanted said insurance because he planned to start on a vacation and pleasure trip, and therefore wanted additional protection and insurance, which statements were believed and relied upon to defendant's injury; that insured went immediately to the Mayo Clinic at Rochester, Minnesota, where an operation was performed on May 28, 1941, for the removal of a cancer which involved the entire rectum; that insured returned home about July 1, 1941, and thereafter concealed from defendant his true condition and the nature of his disease and operation, and the fact of a second operation for cancer of the bladder performed at the Mayo Clinic on March 3, 1942,

and fraudulently stated to defendant's agent in July, 1941, that he simply had a tumor removed from his rectum at the Mayo Clinic and had fully recovered from said operation, and was in the best of health and carrying on his usual work and duties on his farms; that defendant had no knowledge of any operation until September, 1941, when it was advised of the representations which Henry George had made to its agent, and thereupon defendant requested insured to direct the Mayo Clinic to inform defendant as to the nature of his disease and the operation therefor, but although insured promised to do so he failed and neglected to direct said Clinic to give defendant such information, and in fact secretly directed said Clinic and Dr. C. W. Mayo to give defendant no information of any kind concerning his condition and said operations; that in May, 1942, Henry George paid the second premium upon said policies, and had defendant known that insured was suffering from cancer and had been operated upon for that disease in May, 1941, and on March 3, 1942, it would have immediately canceled and rescinded said policies and returned said premiums, and would not have accepted the second premium.

The answer further alleges that when the above facts came to the knowledge of defendant it gave notice to plaintiff that it did not hold itself bound upon said policies of insurance on account of the false statements and fraudulent concealments, and had elected to rescind said contracts, and it tendered to plaintiff its checks for the amount of the premiums paid by Henry George, with interest, and demanded the return of said policies; that plaintiff refused to accept the checks or return the policies.

Many additional allegations of the answer would require too much space in this opinion, and are therefore omitted, and the prayer was that the petition be dismissed, the policies canceled, and the premiums paid thereon be ordered returned to plaintiff.

The plaintiff's reply, in addition to a general denial, alleged that when Henry George went to his banker, who was agent for the defendant, on May 22, 1941, he was again

solicited by such agent to take out insurance, and at that time Henry George made application for life insurance, on printed forms furnished by defendant, and that all the writing, with the exception of the signature, was the writing of defendant's agent, and the answers were the answers of defendant and its agents, and that the application did not properly record the information given them by deceased; that deceased was not experienced in insurance matters, and relied entirely upon defendant and its agents. Plaintiff states that at the time application was made Henry George was a strong, robust man, and that any affliction he may have had appeared to be of a trivial nature, and he believed he was in good health and had no serious ailments; that he was requested to submit to an examination by defendant's medical examiner, who confirmed his own belief that he was in good health and had no serious ailments.

Plaintiff states that shortly after said application was made, and while insured was on a trip, he became ill and went to the Mayo Clinic for a physical examination, and the doctors there performed an operation for the removal of a tumor from the colon; that the operation was successful, and the latter part of June, 1941, he returned home and resumed his normal activities as a rancher and farmer; that upon returning home he immediately reported to defendant company that he had been operated upon at the Mayo Clinic and a large tumor of the colon had been removed, and thereupon defendant through its agents frequently observed the insured and made inquiries of his health, and that insured was not informed by any of the surgeons who attended him that he had cancer until a few days before his death; that he believed that he had fully recovered and would live his normal life expectancy; that defendant, having observed the physical condition of insured and being anxious to collect the premiums on the insurance, waived any objections it may have had to the validity of the application and accepted a second premium of $515 and issued receipt therefor.

For further reply plaintiff alleges that Will George, a

brother of Henry George, died in March, 1936, in Idaho, and that it was reported in the papers and generally in the community that he had died of influenza; that Henry George and plaintiff had received no word from the family about his death, and believed that he had died a natural death of influenza; that the facts pertaining to the death of said Will George, or that his sister was in the State Asylum, did not in any way affect the insurability of the life of Henry George.

Plaintiff further states that defendant was informed during the lifetime of Henry George that he had been operated upon for the removal of a tumor of the colon within a few days after the insurance application had been executed; that defendant took no steps to cancel the policy, nor did it tender back to Henry George during his lifetime the premiums he had paid, but on the contrary accepted said premiums; that by reason of such conduct of defendant it has waived any invalidity that may exist in the application, and is estopped to set up the defenses alleged in its answer; that Henry George on May 1, 1942, paid a second premium of $515, all of which defendant accepted, and has not at any time made any proper and sufficient tender of said funds, and by reason of its acts has affirmed the contract of insurance. Wherefore, plaintiff prays that she may recover judgment as prayed.

On December 16, 1942, trial was commenced to a jury, and at the conclusion of the taking of evidence defendant moved the court to instruct the jury to return a verdict for defendant, or in lieu thereof to discharge the jury and enter a judgment for defendant and to order the sum of $1,070.62, the amount of premiums paid with interest thereon, to be returned to persons lawfully entitled thereto, which motion was sustained, and the court so ordered.

The plaintiff sets out a number of assignments of error as grounds for reversing the judgment of the trial court. It is set out that the court erred in withdrawing the case from the jury and entering judgment for the defendant; that the court erred in concluding that the question as to

whether misrepresentations had been made in the application was not a fact to be determined by the jury, and erred in holding that the acceptance of the premium, and defendant's failure to bring action during the lifetime of the deceased waived any misrepresentations that might have been made in the application, was not a question of fact which must be submitted to the jury; that the court erred in holding that it was not necessary for the company to attach the entire application to the policy; that the court erred in finding that the testimony of the doctors who treated Henry George was not privileged, and that said testimony was competent; that the court erred in holding that the policy did not constitute the entire contract between the parties, and that the medical part of the application which was not attached constituted a part of the contract; that the court erred in finding that the defendant was not barred from pleading and proving alleged falsity of representations in the medical part of the application which was not attached to the policy.

The trial of the case began on December 16, 1942, and the taking of the evidence was concluded six days later, and the evidence is found in a thick bill of exceptions and two packages of depositions, and it would extend this opinion beyond its proper length should we endeavor to set out a fair synopsis of the evidence of the many witnesses. We believe under the circumstances that the requirements of the opinion will be met by saying generally that each party tried to support the allegations of their respective pleadings by their evidence, and that the trial court held that the evidence produced by the defendant was sufficient in law so that if the jury had returned a verdict for the plaintiff it would not have been allowed to stand.

We will take up the evidence as to the knowledge of the deceased of his physical condition when he signed the application for insurance on May 22, 1941. The insured had been treating with Dr. T. J. Kerr, of North Platte, who had been their family physician for about 18 years. During the year preceding May 22, 1941, Dr. Kerr had pre-

scribed for a persistent diarrhea, which defendant had been troubled with for a long time. The deceased had also lost weight, which he explained by saying that he was on a diet. Insured had had a urinalysis made on November 27, 1940. When he was in Dr. Kerr's office on May 17, 1941, the doctor was alarmed over his continued diarrhea and colitis, and told him that, if he would not submit to his making a check-up, he should go to some place for a check-up, and he suspected that his persistent diarrhea and loss of weight was quite a serious situation, and he suspected indicated some form of malignancy, but did not tell that to the deceased. He advised him to see Dr. Louis E. Moon of Omaha, who was a specialist in rectal conditions, or to go to the Mayo Clinic at Rochester.

The evidence shows that on May 19 Mr. George was in Lincoln and had some deeds made, putting his property in survivorship with his wife, and that he then drove to Omaha to see Dr. Moon.

Dr. Louis E. Moon testified by deposition that he was a graduate of the University of Michigan, and his specialty was proctology, diseases of the anus, rectum and colon, and that he had Mr. George go to the Immanuel Hospital for an examination that same evening; that the following morning he performed a biopsy upon him, which means that they took some of the tumor tissue from within the rectum for microscopic examination. The next day the laboratory reported on the specimen taken, and the diagnosis was "adenocarcinoma," which means a cancerous tumor. He testified that Mr. George remained in the hospital for 24 hours until he got this report from the laboratory, and left the next day; that X-rays were also taken. Dr. Moon testified that he advised Mr. George to have this tumor taken out, and that he should be operated on. "Q. Did you tell him that he had cancer? A. That I don't know. In answer to that I will say this: The patient always says, 'Is it a cancer?' And as a rule we say, 'It is a tumor which will become cancerous if you leave it,' rather than say outright, 'You have a cancer.' And occasionally the individual will

pin you down and say, 'What I want to know is this a cancer?' and to some of them I will say, 'Yes', and to some of them we will evade the answer again, and I don't recall the conversation, but he was told he had a tumor that would become a cancer if he didn't do something to it—I don't know."

This evidence discloses that the biopsy was performed on May 20, and the next day the report of the microscopic examination and his talk with Dr. Moon advising an immediate operation on this large tumor, and the next day, May 22, Mr. George went out to Gothenburg and at once applied for this $10,000 worth of insurance, and in his answers in his application for insurance to the doctor he states that he has not consulted a physician in the last ten years; that two days later the insured arrived at the Mayo Clinic at Rochester, Minnesota, and four days later on May 28, 1941, Dr. C. W. Mayo removed this large malignant tumor, and with it his entire rectum, by an operation known as colostomy, fixing a new opening in his side for bowel movements. The two policies had been delivered by mail on June 3, 1941, and the insured returned from the Mayo Clinic on July 1, 1941.

It is very evident that the insured, when told by Dr. Moon of the seriousness of his condition, immediately went from Omaha to Gothenburg and secured $10,000 of life insurance and then started for the Mayo Clinic to be operated upon, and deliberately concealed all of these facts from the defendant.

Untrue answers in an application for life insurance in regard to matters which are shown to be within the knowledge of the applicant and are material to the risk will avoid the policy. See *Royal Neighbors of America v. Wallace,* 73 Neb. 409, 102 N. W. 1020; *Bryant v. Modern Woodmen of America,* 86 Neb. 372, 125 N. W. 621; *Gillan v. Equitable Life Assurance Society,* 143 Neb. 647, 10 N. W. 2d 693.

Section 44-602, Comp. St. 1929, provides in the fourth paragraph thereof as follows: "A provision that all statements made by the insured shall, *in the absence of fraud,*

be deemed representations and not warranties, and that no such statement shall avoid the policy unless it is contained in a written application, and a copy of such application shall be endorsed upon or attached to the policy when issued."

An examination of the bill of exceptions discloses that attorney for plaintiff objected to questions concerning the medical examination for the reason that the application was not attached to the policy *in its entirety* and therefore it is not competent to inquire concerning the medical examination, which appears to be a part of the application. "THE COURT: The objection is overruled, the exhibit, however, not being treated as any portion of the contract."

The answers made to the medical examiner consisted of a single sheet, but printed on both sides. The front side was marked "Part II," and also as exhibit 2, and it consisted of 26 questions and all of the answers thereto, and was signed at the bottom by Henry George, and this exhibit 2 was offered in evidence, and at first the objection to it was sustained. The next day it was again offered, with the statement by attorney Murphy, "I want it understood that we offer in evidence at this time only Exhibit No. 2, and not Exhibit No. 5," and the objection was overruled, and exhibit No. 2 was received.

A photostatic copy of this exhibit No. 2 was attached to the policy, as required, and included all of the answers referred to in this opinion. Dr. Stevenson was shown exhibit No. 5 and asked if Mr. George signed it, and he said he did not. This exhibit No. 5 was found on the back of the page, exhibit No. 2, and shows, among other things, a little picture of a pair of lungs, the result of the urinalysis, together with height, weight, pulse, blood pressure, and sounds of the heart of Mr. George. This exhibit No. 5 is not involved in any way in the charge of fraud as discussed in this opinion. We do not find that exhibit No. 5 was offered in evidence, and it was not attached to the policy. But exhibit No. 2 was offered in evidence, received by the court, and read to the jury.

The false representations accompanied and were essential parts of the policies delivered to the insured. He did not repudiate, and therefore adopted and approved, the representations upon which they were based. An applicant for insurance should exercise toward the company the same good faith which may be rightly demanded of it. The relationship demands fair dealing by both parties.

"The importance of a false statement by an applicant for a policy of insurance as to whether he has consulted physicians lies in the fact that he conceals from the insurer the fact of such consultations and thus deprives it of the opportunity of making an independent investigation and of obtaining further information, so as to enable it to decide for itself, in the light of the additional information, whether to enter into the proposed contract or what premium to charge." 131 A. L. R. 618, Annotation.

"Under the Kansas law, insurer was not liable on life policy where, in answer to questions in application, insured failed to disclose that within five years prior to date of application insured had consulted several physicians and had been hospitalized and treated for slight swelling in right testicle and uncontradicted evidence showed that death resulted from cancer having origin in right testicle. Gen. St. Kan. 1935, 40-418." *New York Life Ins. Co. v. McCurdy,* 106 Fed. 2d 181.

In *Scott v. National Reserve Life Ins. Co.,* 144 Kan. 224, 58 Pac. 2d 1131, decided July 3, 1936, it was held that where proof of alleged fraud becomes conclusive by uncontradicted evidence and written admissions showing falsehood, concealment, and misrepresentations on part of applicant to insurance company, question of existence of fraud becomes matter of law instead of issue of fact for jury, in which case the supreme court modified its former opinion and caused judgment to be entered for the defendant, the facts in the case showing that the insured had falsely answered question 6A in that he previously had applied for insurance in another company and had been rejected by it.

"The proper rule of law is that in an action at law on an

insurance policy an assured may not, by parol evidence, impeach the written statements of the assured in the application in those cases where the application has become a part of the contract by stipulation and in accordance with statute and a copy thereof attached to the policy at the time of delivery." *Gillan v. Equitable Life Assurance Society*, 143 Neb. 647, 10 N. W. 2d 693.

"Where fraud or misrepresentation is material with reference to a transaction subsequently entered into by a person deceived thereby, it is assumed in the absence of facts showing the contrary that it was induced by the fraud or misrepresentation." 2 Restatement, Contracts, 915, sec. 479.

"The principle is often stated, in broad and sweeping language, that fraud destroys the validity of everything into which it enters, and that it vitiates the most solemn contracts, documents, and even judgments." 23 Am. Jur. 770, sec. 19.

The insured waived the privilege of keeping his several doctors' testimony secret, which is granted by section 20-1206, Comp. St. 1929, by signing his name at the bottom of Part II entitled "Answers made to the Medical Examiner in continuation of and forming part of application for insurance in the Guarantee Mutual Life Company, of Omaha, Nebraska," and just above this signature of the deceased are these words: "I hereby declare that all statements and answers as written or printed herein and in Part I of this application are full, complete and true, whether written by my own hand or not, and I agree that they are to be considered the basis of any insurance issued hereon. I hereby authorize any physician or other person who has or may attend me to disclose to said Company any information thus acquired."

Therefore, the testimony of the doctors treating the insured was competent and admissible. See *Willis v. Order of Railroad Telegraphers*, 139 Neb. 46, 296 N. W. 443; *Parker v. Parker*, 78 Neb. 535, 111 N. W. 119; *Western Travelers Accident Assn. v. Munson*, 73 Neb. 858, 103 N. W.

688; *Wolski v. National Life & Accident Ins. Co.*, 135 Neb. 643, 283 N. W. 381.

The plaintiff insists that the collection of a second year's premium, with knowledge of the fact that insured had undergone an operation, was a waiver of any grounds of fraud in the application and issuance of the two policies.

The evidence discloses that on December 4, 1941, Ralph E. Kiplinger, an agent of the defendant company, went to the ranch home of the insured, and told him the company had heard that insured had been at the Mayo Clinic, and asked him to sign a paper giving permission for that Clinic to give out information about his condition. The insured replied that he had had a little operation, but it did not amount to much, and he was feeling fine, but he refused to sign the paper, although requested to several times thereafter by letter.

However, the insured did not forget the request, as on February 7, 1942, he wrote a letter, being exhibit No. 3 attached to the deposition of Dr. C. W. Mayo, saying: "Please never let any one ever find out anything about my operation. Some Insurance Co. is trying to find out all about my operation."

"Where insured has made several separate and distinct misrepresentations in application for life policy, each designed to deceive insurer and each material to the risk, a partial, fragmentary, or incomplete disclosure of falsity to insurer thereafter is insufficient to avoid the effect of fraud, and the knowledge thus acquired by insurer is insufficient basis for a 'waiver' of its right to cancel policy for any of the misrepresentations." *Martinson v. Prudential Ins. Co. of America*, 294 N. W. 525 (236 Wis. 110).

"It is a general and salutary custom of life insurance companies, in the interests of their policy holders as well as themselves, to obtain through various channels, information in respect to applicants for life insurance additional to that which the applicants themselves afford, and it would be unreasonable to hold that such an independent investigation of itself deprives an insurer of the protection of this

rule. To have this effect, the investigation, as we have seen, must disclose facts sufficient to expose the falsity of the representations of the applicant or to put the insurer upon further inquiry." *Provident Life & Accident Ins. Co. v. Hawley,* 123 Fed. 2d 479.

"Waiver" is an intentional relinquishment or abandonment of a known and existing right, benefit, or advantage, and there can be no waiver unless the party against whom it is invoked was in possession of material facts and acted with the intent to waive, in which respect it is different from estoppel.

The doctrine is well stated in 29 Am. & Eng. Ency. of Law at p. 1093: "There can be no waiver, unless the person against whom the waiver is claimed had full knowledge of his rights and of facts which will enable him to take effectual action for the enforcement of such rights. No one can acquiesce in a wrong while ignorant that it has been committed, and that the effect of his action will be to confirm it." See, also, *Provident Life & Accident Ins. Co. v. Hawley, supra.*

In the case at bar, the deceased was not in good health, as Dr. Moon had told him the seriousness of his rectal tumor and had advised an immediate surgical operation. He had been under care and observation in a hospital, X-rays had been taken, and a biopsy made of the diseased tumor, all within two or three days of his applying for and securing this $10,000 worth of insurance, and the several representations which insured made over his own signature negatived each and all of the above facts. To permit a recovery under all the evidence and circumstances shown by this record would be to sanction fraud. See *Penn Mutual Life Ins. Co. v. Lindquist,* 130 Neb. 813, 266 N. W. 600.

We have examined each and all of the other assignments of error, and have discussed at so much length the ones which challenged our attention that we can only say that we find no merit in any of the others.

The losses paid by an insurance company fall ultimately upon the policyholders. It is in the interest of all insured

persons to have their insurers safeguarded in their right to select risks upon adequate and truthful information.

In the case at bar, we believe that the evidence, although conflicting on some minor points, was so conclusive that it was insufficient to sustain a verdict and judgment. That being true, the trial court properly took the case from the jury and entered a judgment for the defendant, for there was no issue to be submitted to the jury.

AFFIRMED.